Good morning, Randall Barnum for the appellant and the plaintiff in the case. That's Carol Goos. And I'm going to try to save some of my time as well. But a couple of points to make at this juncture. Our position is that the court granting of Shell's Rule 50 motion was both procedurally and substantively in error. I think it probably makes most sense for me to address the procedural issue. We addressed this in our reply brief in response to the appellee's citation of the Summers case in particular. But basically it was improper for the trial court to grant the motion in the manner it did because it failed as required under Rule 50A, I believe, Subpart A, to apprise us of the alleged deficiencies in our proof or the deficiencies in the evidence. It was an oral motion. And I pointed out today, and basically the motion was argued more along the lines of the weight of the evidence, and I pointed out to the court at that point that we were legally entitled under Rule 50A to be apprised of where the specific deficiencies were lying with regard to the evidentiary proof. And the court did not and would not provide us with that information. In fact, Judge Breyer basically said, and we quoted that in our brief, you are the lawyer, you figure it out, or worse to that effect. There was a written brief filed to support the motion, but that was filed during the oral argument. So we did not have the benefit of, in other words, it was filed electronically, literally at the time oral argument on the Rule 50 motion was occurring. So we did not have the opportunity to address that motion. And then that evening we received the court's order. Again, we did not have the opportunity to respond to the court or the court's pointing out deficiencies. And that's important because had we had that opportunity, the court's order is an error in a couple of very specific respects. Number one, the court's Rule 50 order granting judgment identifies or says that it has now disposed of the remaining two causes of action. That's just not correct. When the trial started, there were four claims, not two. The four claims were disability discrimination, failure to prevent discrimination, failure to engage in the interactive process, and the failure to accommodate disability. So there were four claims, not two. The court also ---- Well, when the court started the rule, though, they said they were going to dismiss your discrimination claims. And aren't you the one that said, well, actually, those are predicate claims to our failure to accommodate and failure to engage in the interactive process? Isn't that how that came about? I'm sorry. I missed the first part of your ---- I was walking over there. You're on assist. If the oral argument on the summary judgment motion, when the court indicated he was going to dismiss your discrimination claims, you basically suggested he not do that because those were predicate claims to your failure to accommodate and failure to engage in the interactive process. Yes. The court ---- Were you talking about summary judgment, Your Honor? Yes. In other words, if those ---- if your failure to accommodate and failure to engage in the interactive process claims failed, then your discrimination claims would automatically fail. Well, at that point ---- at that point, correct, Your Honor, but what happened subsequent to that was that ---- see, when we first filed the action, the client or Ms. Gose was still employed. What happened subsequent to the motion for summary judgment that you're referring to is that she was subsequently terminated from employment. So at the time of trial, we had an additional basis, an initial factual basis for the discrimination claim. That is the termination. The purpose, as I understand it, of having this somewhat special rule under Rule 50 is so that you could go back before the jury and put on any evidence that you didn't already put on. That's one ---- that's one purpose, Your Honor. But I think the other purpose is for me to point out to the court, to argue to the court, this is why the evidence and proof is sufficient. I did not ---- I did not have that purpose. But you have a chance now to make that legal argument. You had a chance then. You have a chance now. He considered that. The real reason why there's something special here is because if the jury is dismissed, you can't get back to that jury. So you're supposed to have a chance to hear what your deficiencies are and, as I understand it, put it on. You may have a ---- reopen your case, essentially. Is that the notion? Well, you're correct. I think to the extent that you're referring to, I mean, the review here is de novo. So you get to see everything and consider everything. So I have the opportunity now to argue substantively. The only way in which this procedural problem matters is if there's something you would have put on had you known what his problems were but didn't. Sure. Would have put on. Would have corrected the court with regard to its saying there were only two claims. I would have corrected the court where the court said in its order, and this is a ---- But that's just a question. That's a legal argument, which is no different than any other legal argument, it seems to me. And you have a chance. You have to file a motion to reconsider. You can file a motion. You can file an appeal. You did file an appeal. The problem comes up when the judge says you didn't prove X. And you said, oh, I can prove X. You know, I'm going to call so-and-so. Right. Well, that's right. Anything like that. Hypothetically. Is there anything of that character here? Well, there is the point. Well, specifically, I don't know, because I've never been even in the court's order, the court doesn't even say or identify a particular element that was not proven. I don't know if the court is saying prove you didn't prove that Ms. Goes had a qualified disability. I don't know if the court said ---- I don't know the basis. That's sort of the problem even now. I don't know where the court found proof insufficient. And the court even fundamentally, Your Honor, if I just might point out the one, the from the order at page 12 of the volume one of the record, the court has previously held in its order on the motions for summary judgment that plaintiff's claim for failure to reasonably accommodate was extinguished as a matter of law when counsel sent Schell a demand letter in June of 2007. Well, that's absolutely an incorrect statement. The court did not adjudicate that issue in the summary judgment motion. So the court is indicating here in its order, again, had I been apprised of this at the time, I could have pointed out to the court ---- But that's not something you would have put back, you would have gone back in before the jury. No, I would have at least ---- You're just arguing that Judge Breyer didn't give you enough opportunity to correct errors in his written opinion that you would have liked to have had. Yes, and that's important, because if he's thinking of the Rule 50 motion, the claim for reasonable accommodation or failure to reasonably accommodate is gone from the case. And I think that's significant, because my whole case was focused on that. So ---- Aside from your opportunity to have corrected Judge Breyer's mistakes, why don't you tell us what the mistakes are? The ---- Well, fundamentally, I disagree with the court's ---- and he sort of repeated this about the order, about Schell having to be clairvoyant about what the plaintiff wanted in terms of accommodation. That's something that he repeats. Mr. Barnum, maybe I can help you. I'm not speaking for either of my colleagues. But let me tell you what bothers me about this case. Maybe you can address that. Throughout Ms. Goss' dealings with Schell, her doctor is telling them that she is not capable of coming back to work. And she doesn't appear to be coming back to work at all. Correct. Your letter, your June letter, threatens Schell with trying to force her back to work, which would suggest that she's not coming back to work under any circumstances. The only thing that really looks contrary to that, to me, that looks contrary to that, is the report from Dr. Fenner. And Dr. Fenner has some equivocal language that says, well, she and I discussed this, and I'll have to defer to her doctor. Now, what was Schell supposed to do when they got Dr. Fenner's report that Schell didn't do? Oh, what Schell should have done, and keeping in mind, Your Honor, it's really important in terms of timing that. When I'm writing that letter, I don't have the benefit of Dr. Fenner's report. My client doesn't have the benefit of Dr. Fenner's report. I reference it in my letter specifically to say we know she's been evaluated. That's pending. We're waiting for that report. Were you surprised to learn from Dr. Fenner's report that she was capable of going back to work to Schell? That's not what you told Schell, and that's not what you were hearing from her psychiatrist. Well, it provided me with very specific information that I did not know at the time. Did you ever send anything back to Schell to indicate that now, in light of the Fenner report, that you had a different view of the case? We filed a complaint in the case that starts with the administrative complaint with the DFVH, and this action specifically identifies that case scenario. Absolutely. It were those facts. I did not believe that I needed to tell Schell what it knew already, Your Honor. This is a doctor that it hired. But it might have given Schell an idea that you had a different view of the case than you had, because this was a demand letter for whatever was $350,000, because your theory of the case was that Schell was forcing her back to work when she was not capable of coming back to work. That's right. If, after seeing the Fenner report, you had a different view of this, you didn't go back to Schell and say, we thought differently. What we really want to do is put her over on the administrative side. Your Honor, I did feel differently about it, because I knew at that point, in July of 2007, I knew for a fact that Schell had this letter for at least three months before. So I knew for a fact that they were not following their obligation. When their doctor tells them in response to their question, how can we accommodate this employee, and the doctor says, makes two suggestions, and they completely sit on it, I know for a fact at that point they are breaching their affirmative legal duty of accommodation. One question I have is this letter that was attached to the DFVH complaint, is that the same letter you're complaining about as not being admissible because it was part of negotiation? It is. But how can that be when you attach it to your DFVH complaint? Your Honor, it doesn't change the – regardless of what I attach it to, regardless of what I – whoever I give it to, it doesn't change the fact, the character of the letter being a settlement letter. But you attached it as a description of your problems. I understood it, that it was attached to the DFVH complaint as your description of the underlying claim for the purposes of that agency investigating the claim. So you had already exposed it to, for essentially evidentiary purposes, to a governmental agency. Well, I don't know about – it doesn't change – but I don't think for evidentiary purposes, Your Honor, because it doesn't change the nature of the letter. It's not as though – It does change the nature of the letter. The letter now has two functions. One was to – originally it may have been part of negotiations, but now it's your enunciation of your claim for litigation purposes. But it doesn't – it's not like a privileged letter that we're disclosing, and therefore you waive the privilege. The public policy goes to the character of the communication. If this is intended as a settlement letter, which it clearly was, then I'm supposed to be able to lay my cards on the table. But why couldn't it change its character so that when it was – and it's very important, because it appears that that letter is – there are two critical letters in this case. That's one of them, and the other is the doctor's letter. And the – and her – and this letter, it seems to me, while written, could have had one purpose when written, but a second purpose when attached to this complaint, which was not for negotiation purposes. It was for a purpose of explaining to the agency what your complaint was. Well, yes. I don't – the letter had several purposes, but one of the clear purposes, because it said at the first paragraph, at all times, the purpose was for settlement purposes. That's set forth expressly in the beginning of the – Did that – did Judge Pryor – I assume you – you affirmantly objected to the introduction of this letter, and then Judge Pryor made an evidentiary ruling, which was what? Well, we – we objected to it. We filed a motion to eliminate on it. He allowed the – the evidence. On what basis? And it wasn't – and I never was clear on the basis for the ruling of allowing it in, Your Honor, but he did allow it in, which is – became the rule of law. So I think I have about 56 seconds, so I think that's it for that. Thank you. Good morning. I may please the Court. I'm Gary Lafayette, and I have the pleasure of representing the Shell Oil Company today. I think the points that I've heard this morning are the central points in this case. And that's this. Consistently, from the point in time in June of 2006 when Ms. Goss stopped reporting to work, her doctor submitted letters to Shell Oil Company that indicated that she was unable to work. The first ones actually stated that she had a debilitating depression. Going through the summer of 2007, the same thing, a debilitating depression. And even Ms. Goss says during that summer of 2007 that her depression was so severe she couldn't work. Why wasn't Shell under an obligation to circle back to Ms. Goss, at least make a phone call and say, look, we've read the – we've talked with Dr. Finner, and you mentioned to her that you might be interested in coming back as a planner. And why wasn't Shell under an obligation at that point to at least circle back and say, did you really want to come back as a planner? If so, come on in and let's talk about this. Let's talk about that for a second. Because I think what you see is there's an e-mail that was prepared on April 3, 2007, by John Sharp. And the e-mail on that day explains exactly what happens internally at Shell with regard to the Finner report. And what he states here is that in the first instance, Dr. Finner is stating that whether or not she can return back to work in any capacity whatsoever is going to be based upon the determinations of her two treaters. That's in Dr. Finner's report, and that's what John Sharp writes on that very same day. But he also writes, and this I know for some reason hasn't been noted anywhere along the line, that he thinks we've already decided that she can't come back as a planner. That's because a planner is a promotion position. And the case law is quite clear. You cannot offer a company to give a promotional opportunity as a means of accommodation. But that means, I mean, that's intriguing, although unexplored, because it suggests that they didn't necessarily think that she didn't want to come back, and they had thought about this, and that although they're now saying we thought she didn't want to come back at all or couldn't, in fact, there was some sort of internal discussion about whether she could come back as a planner. Actually, based on the record that we have before us, the only thing we have is John Sharp's e-mail, which he sends out to people just to alert them as to what's happened.   And he's got a lot of information about whether she can come back as a planner. And one of the things he says is we already considered whether she can come back as a planner. I don't think that's what he said. What he actually said is I believe this has previously been ruled out as an option because it's not the same thing I said. It may be, Your Honor. But I think what he's basically saying, it's a promotional opportunity. But that's not my point. My point, you know, maybe I should have been cross-examining him at the trial or putting this on at the trial. But I suppose what it indicates to me is that there was some internal recognition of the possibility of accommodating her in another job, and there was some inquiry made as to what jobs might be available, and a determination was made not to offer her the planning job. So the notion that everybody was operating on the theory that she couldn't come back under any circumstances and that she didn't want to seems slightly belied by that. I think if you look at the total history here, and let's take us then back to October of 2006, because in October of 2006 is when John Sharp and Dr. Sorensen start reaching out to Dr. Brandes to see if Dr. Brandes is going to release her to return to work in any capacity whatsoever. And Dr. Brandes declines to do that. Instead, what Dr. Brandes continues to do thereafter is to send MedCert letters in advising that she is unable to work. And he not only does, and he does that, and this is one of the things I was trying to get to in John Sharp's April 3, 2007, email. John Sharp acknowledges in that email, on a separate note but related note, we received an updated MedCert form from Employees Treating Physicians on 3307 that extends off-work status to 52407. So in addition to everything else that's happening, this doctor really is communicating to the Shell Oil Company that she is unable to work. And he continues to send these things out to Shell Oil Company throughout this entire time period. I mean, one does get the overall sense from this record that, you know, this was a bunch of, quite arguably, a bunch of unfortunate misunderstandings between people where if they'd only bothered to talk to each other, they could have gotten over some of them. And did anybody ever call up, Carol goes and say, are there circumstances in which you would return to work on another job? Or did anybody ever say to Dr. Brandes directly, you've said she can't return to work, could she return to work? Do you mean only as a machinist or do you mean in no job? I think where we look there is, again, we go back to that dialogue in the fall of 2006. Because if you think about that dialogue, that's where Dr. Sorensen brings her in to his office and asks her specifically about returning back to work. That's where Dr. Sorensen says you can't. But isn't it quite possible that they were just misunderstanding each other, that when she and Dr. Brandes talked about going back to work, they assumed that meant going back to her work, the job she'd had. And when – and perhaps Schell had something else in mind and they weren't talking to each other in the same language. There's – the problem with that, Your Honor, is there's nothing in this record that in any way suggests that that's the problem. What we do understand is this. And we know this from plaintiff's own testimony. This started in late 2006. She had legal counsel. And the most significant thing about what she says about having legal counsel is – and it's on page 117 and 118 of the trial transcript, and this is day one, which is April 5. She specifically states that she retained Mr. Barnum to handle her communications on her behalf with regard to the Schell Oil Company. That's the first thing. The second thing she says is that she had in her mind she would not ask Schell to return back to work because she was in litigation. That's the other thing that she says. So when you look at this, there's no misunderstanding here. There simply isn't. What Schell is doing, it is consistently talking to her, consistently trying to talk to Dr. Brandeis. And in the interest of just trying to move this forward, it takes the additional step of sending her out for an IME. That is not a company that is refailing and refusing to engage in the interactive process. And when you look at what it did, in order just to be able to have a conversation with Dr. Brandeis, it sent out the release asking for that permission. And what Ms. Goss did was she hand wrote in a restriction with regard to the level, quality, and type of communication that we could have. So with that in mind, how possibly could the Schell Oil Company have ever come up with any form of accommodation if it can't in the first instance get the very basic of information, which is can she work under any conditions with a restriction? We don't even get that. The best that we ever got was that she is unable to work. And the most significant thing is actually the letter that Mr. Barnum wrote. Because Mr. Barnum's letter reiterates that she has a debilitating depression that prevents her from working. His letter caps off everything. Because at the end of the day, and what you listen to Mr. Roulin-McKay's testimony in this case, Roulin-McKay testifies that once he got that letter, he knew that in any efforts that he would take thereafter would be courting a lawsuit based upon Mr. Barnum's claim that he is going to sue if they do it. And so we're sort of caught between the classic, you know, this if I do, this if I don't. And I'm being careful with my language because I'm in court. But it's a Hobson's choice. What am I supposed to do? And then what do we get? We continue to get the MedCert letter. Going further, what's at the end of the road? The end of the road is actually April of 2009. And in April of 2009, she has now exhausted her leave, and the Shell Oil Company says, if you want to come back to work, let us know. It doesn't say as a machinist. It says if you want to come back to work, let us know. Get your doctor to sign off on it. Let us know. Okay? And we'll deal with that. What do we get back instead? She writes back and she says, I want a disability retirement. That doesn't sound like the person who's saying they want to come back to work. This is not a case in any way whatsoever where you can say the Shell Oil Company didn't engage in the interactive process and the Shell Oil Company didn't attempt to try and determine if she could come back to work. But the position is that Shell Oil Company had no, aside from the interactive process, had no obligation to offer her an accommodation of an alternative job because she didn't ask for one or what? I'm not saying that. If she had asked for one, we'd be having a whole different story. But are you saying she had to ask for one? No. What I am saying is she has to, in the first instance, identify what her restrictions are so we can even evaluate that. And if we're going to go down that road. Well, the law, the rule is she has to give notice of her disability and express her desire to be accommodated, I think. That's correct. And that's your position is that never happened? That never happened. In fact, your IME letter also went to Dr. Brandes, didn't it? It did. Dr. Brandes had it and Mr. Barnum had it. And after Dr. Brandes got it, he still just submitted to Shell the same certificates? That's correct. And never indicated any indication of wanting to be accommodated? Never. Okay. And on this issue of, I will say this quickly, because I know my time is probably running out, but on the day before the hearing on the Rule 50 motion, Judge Breyer extensively covered what he thought would be the issues, the issues that he had identified as possible issues on the Rule 50 motion. And the comment that plaintiffs got, that Mr. Barnum made at that point in time, was that was a good preview of what we were going to have to deal with the next day. The next morning, the defense counsel, myself, made a 45-minute presentation of what the evidence was all about as part of the Rule 50 motion. And if you read through what Judge Breyer did. The one mistake Judge Breyer made, and the question is does it matter, is he said he had already ruled about this 2007 letter having cut off any possibility of accommodation or interactive process problem, and he really didn't or didn't. No, that's not actually it. If you go back to the hearing transcript for the hearing on the motion for summary judgment, where Judge Breyer started out in that transcript on the hearing on the summary judgment, is he essentially said, and this appears on page three of that transcript, okay, I believe I will deny the judgment for both parties on the failure to accommodate claim. I will deny the judgment for both parties on the failure to engage in interactive process claim. However, I will grant judgment for defendant on the plaintiff's claims for discrimination, harassment, and retaliation. And then he goes on to say in that same passage on page three, lines 10 through 13, that he is concerned about the viability of the failure to accommodate claim going forward. And the rest of this discussion is about what he is saying, because what he is saying is he doesn't see how you can go forward with that claim after Mr. Barnum wrote his letter on that date. And so we can't. Kagan. It wasn't a formal ruling, but it was an expression of concern. It was an expression in his – in the transcript of that proceeding. And so then what you get to – and I was quite concerned about this, because I looked at the complaint. And I think the complaint accurately states that the discrimination claim is the failure to accommodate and the failure to engage claims. And it embraces within that a failure to prevent, which under Trujillo v. North County Transit District, that claim falls out if you don't have a predicate claim for discrimination. And that's just the way it is. And so at the end of the day, the only thing that was left for this trial, and which is what Judge Breyer consistently stated, is that there was the failure to accommodate claim and the failure to engage claim. And if those are gone, then the judgment is appropriate to be given in this case, because that's all that was left. And as he was looking at it pre-2007. I couldn't hear you. Pre-June of 2007. And as he was looking at it, they both had gone away as of the letter. So what was on trial was essentially the period before that. That's correct. That's correct. And so all we had was the failure to accommodate and the failure – and in this instance, what we see is looking at the totality of the evidence. And that's the evidence starting from the date that she went on her leave all the way up until the point in time in which she declined to take the disability leave. Okay? What she said is she wanted the disability retirement as opposed to anything else. What we see is a consistency. And that consistency that we see is at no point does she ever say that she wants to come back to work in any capacity whatsoever. And at no point are there any restrictions given. And at no point is there anything that Shell Oil can hang its hat on and say we can do anything other than what we ultimately did was to accommodate. And the last piece, I think the appellant's counsel is spinning a Hansen case on his ear. Hansen said that a long leave can't be an accommodation. It just said you can't force an employer to do that. And that's clear when you read the opinion. But I think my time is up. Thank you. Okay. Yes, you are. Perfect timing. Thank you very much. And thank you for a very useful argument. Sir. Thank you. Quickly, it's just simply legally incorrect to put the burden on Carol Ghost, the plaintiff, in the case. It's just not correct. And I'll cite the case that the court actually cited in its order. The interactive process of fashioning an appropriate accommodation lies primarily with the employer.  that the court actually cited in the case says that the employer has a right to go back to work. That's the King v. United Parcel case. And are they obligated to do that in the face of a medical report says she cannot return to work? Yes, Your Honor. Because once they can't return to their position, which you brought up, Your Honor, then the employee's got to look at alternative positions. That's all that Dr. Brandes was saying. But it isn't what he said. I mean, it seems to me, and I'll repeat to you what I said to him, this was a failure of communication on both sides. Because if Dr. – at least, I mean, maybe it's more than that, but it's at least that. Because if Dr. Brandes and your client thought that's what was meant, but really thought that she could work at some other job, then they could have said that and they didn't do it. But, Your Honor, they were sitting on this report for three or four months, and they knew it. But there was a year before that. No, no, no. That was in – that was months before my letter. They're sitting on this letter. They're not getting the report from Dr. Brandes. Excuse me, the report from Dr. Fenner. But there's a year before that when Dr. Brandes is writing letters saying that she can't go back to work at all for anything. No, no. As a machinist, Your Honor. He never said as a machinist. But he's a treating doctor. That's the point. He's not specific, and he doesn't ask, and she doesn't ask. He was never – Dr. Brandes was never asked by Shell, can she go back to any other position. Shell never offered that. What they should have done in response to your question, Your Honor, as you said, when they got Dr. Fenner's report, rather than sitting on it, rather than not disclosing it to him, they should have said, look, Carol, Dr. Fenner says you might be able to go back to a temporary planner. You've done that before. Or HR department, can we talk about that? Can we explore those options? Let's see what can be done to help you return to work. But between the time that Shell gets the Fenner report in early April of 2007, your letter, the end of June of 2007. Three months later. Right. Fenner has said, you know, she may be able to go back to work, but I'm going to have to defer to Dr. Brandes. And Dr. Brandes has filed, what, at least three more times a letter saying she can't work. As a machinist. He was never asked the question, isn't it, given the fact that it's the employer's duty to accommodate, isn't it incumbent upon the employer then to send a letter, having their own IME doctor tell them what they get, send a letter to say, look, Dr. Brandes, what do you think about this? Can she do this or not? They were trying to find out. They were trying to have a dialogue with the doctor. If they had been able to speak with him in a non-restricted fashion, perhaps they could have had, you know, a grown-up conversation and this confusion might have been cleared up. But she was putting all sorts of restrictions on anybody talking to him. In particular, she didn't want anybody to know that her problem was with the machinist job. Right. But. Isn't that right? I mean, she specifically didn't want them to say, well, she really is having big problems as a machinist, but she might be okay with something else. But she specifically didn't want them to say. Well, she didn't. No. All she didn't want to know or have them know is the causes of her depression. Which were that she hated her machinist job. No, it wasn't that she hated the machinist job. Well, she hated it because of circumstances that she thought were discriminatory, but it was basically, I hate my machinist job. Sure. And the employer is not entitled to know anything more than can she do this job or not do this job. And, you know, again, when they hire their own doctor to answer the question of accommodation and they get an answer which apparently they did not want, the law doesn't allow them just to. The other thing that's really going on here is that you were trying to. You thought you had and you were trying to set up, and I don't know what happened to, a sex discrimination sexual harassment case and it didn't go. For whatever reason it didn't go. I don't know why. But that's what she saw it as for a year or two. And that's what you saw it as for a while. And that's why you wrote the letter the way you did. Sure. We didn't have Dr. Fenner's report at that time, which put a wholly different light on what the company's obligations were to Ms. Gose, where they had, again, I haven't heard any explanation yet, at any point as to why Shell did nothing with that information and why they had it for three months before they got my letter. Were they going to sit on it? If they never got my letter, I doubt they would ever do anything with that information. But you could have, within weeks after you filed the letter, you've also filed a complaint with the FEHA. Right. And you've attached the letter to it as the basis for your complaint. I mean, at some point, since you've been willing to settle with Shell, evidently for $350,000, you surely could have called and said, you know something, this whole thing can go away if you've got another position for it. Or, you know, I'm willing to talk about some other things now because I looked at this Fenner report. Have you seen this? But you've taken this hard-line position, and at that point we're in litigation mode and the lawyers are on high alert on both sides. Well, Your Honor, it is what it is. But, I mean, the fact is they commissioned the report. They got the information. They had it on. And the fact is, the legal proposition is that it's the employer's affirmative duty to accommodate. They can't not think of five excuses why they don't do something when they have that information. And that's what the legal argument is. Okay. Thank you very much for both of your arguments. They were helpful arguments. And we shall submit the case of Goose v. Shell Oil Company, and we shall recess. Thank you very much. And adjourn. All rise. The court for this session has adjourned.
judges: Whelan, Berzon, Bybee